IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:05CR78-F |
| | ) | [WO] |
| ARQIMEDES ALTAMIRANO-<br>RENDON | )<br>) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This matter is before the court on the defendant's ["Altamirano"][1] Motion to Suppress (Doc. # 25). The only issue for the court to decide is whether the written consent Altamirano executed was voluntary. Upon review of the defendant's motion, the government's response, and evidence and testimony received at an earlier hearing, the court finds that it was, and, therefore, the motion is due to be denied.

### I. FACTUAL BACKGROUND

In mid-March 2005, Alabama State Trooper Will Barnes ["Barnes"] was patrolling a section of Interstate-85 in Montgomery County when he stopped a pickup truck that had twice crossed the line separating the shoulder from the highway (TR. I, pp. 7-8). According to Barnes, he pulled the truck over to ensure the driver was not under the influence of alcohol or drugs or was not simply falling asleep at the wheel (TR. I, p. 8; II, pp. 7-11). Upon

---

[1] At the hearing, the defendant stated his last name as, simply, Altamirano (Transcript of Evidentiary Hearing ["Tr."], Vol. II, p. 2, ll. 17-18; p. 3, l. 4). Although the transcripts are not voluminous, the necessity of two transcripts was occasioned by the first court reporter's excused departure to attend another, previously scheduled, court proceeding.

approaching the vehicle from the passenger side, he noticed an abnormality in the contour of the apparently custom-fitted protective plastic liner on the floor of the truck's open bed, an abnormality he described as "a buckle in the middle of the bed liner toward the front of the truck" (TR. I, pp. 9-10). Drawing on his training and experience with concealed vehicle compartments (TR. I, pp. 20-23), he immediately began to suspect that contraband lay beneath the liner, which was covered with carpet and secured with "drywall screws" (TR. I, pp. 9, 31).

Altamirano, who claims to understand little English, was driving the truck. Barnes, speaking only English, obtained a driver's license from him that was issued in the name of Noel Barragan before inquiring into Altamirano's destination (TR. I, pp. 11-12). Altamirano responded that he and his passenger, a co-defendant in this case, were traveling from North Carolina to Mexico[2] (TR. I, p. 12). After this initial exchange, Barnes asked Altamirano to exit the truck and, following some additional conversation during which Altamirano specifically denied possessing any weapons, to sit in the front passenger seat of his trooper

---

[2]In the following telling exchange between Altamirano and his attorney (through an interpreter), he testified that he actually told Barnes he was traveling to Houston and his passenger was traveling to Mexico:

> Q: What happened following the request for the driver's license?
> A: The officer who's next to the attorney took me to his patrol car and asked me where we were going.
> Q: Was he speaking in English or Spanish?
> A: In English.
> Q: Could you understand what the officer was saying?
> A: No.
> Q: Okay.
> A: I told him I was going to Houston, that it was my friend who was going to Mexico.

(TR. II, p. 6).

vehicle, which Altamirano did (TR. I, p. 14).

Satisfied that Altamirano was not intoxicated, Barnes nonetheless spoke briefly with Altamirano's passenger before returning to his vehicle to issue a written warning (TR. I, pp. 14-15). Around this time, another trooper arrived on the scene, and Barnes informed him of his suspicion regarding the deformed bed liner (TR. I, p. 17).

The facts recited above reflect Barnes' testimony and are not entirely uncontested. Nevertheless, differences thus far are immaterial to the issue of Altamirano's consent,[3] though they do factor into the court's credibility determination, as discussed in greater detail *infra*. Although the court ultimately finds that Altamirano lacks credibility, and his testimony is entitled to little, if any, weight, understanding the outcome of this case requires some familiarity with both versions of events that followed Barnes' return to his patrol car.

According to Barnes, when he returned to his vehicle, he issued Altamirano a written warning and explained to him that it was "not a ticket", words Altamirano repeated before signing it (TR. I, p. 16). Barnes then asked whether Altamirano was transporting any drugs, weapons or money before Barnes sought consent to search his truck. (TR. I, p. 23). Upon confirming that Altamirano read only Spanish, Barnes completed a pre-printed Spanish consent form, which he then handed to Altamirano instructing him "to read the form and [] not sign the form unless he agreed with it understood [*sic*] what it said" (TR. I, p. 23). At the hearing, Barnes stated:

---

[3]For example, Altamirano denied crossing the line, which allegedly gave Barnes probable cause to pull him over in the first place (Tr. II, p. 3). He does not, however, contest the legality of the stop (Tr. I, pp. 5-6).

> He looked over the form, appeared to be reading it. He signed the form, or wrote his name, I guess that's his signature, and he told me it was okay, you know, if I search his vehicle. I don't recall his exact words. He shook his head okay and informed me that it was okay that I looked in his vehicle.

(TR. I, p. 24).

Predictably, Altamirano's version of events differs dramatically. According to Altamirano, while sitting in the trooper's car and talking with the trooper who pulled him over,[4] another trooper on the scene began to walk around the bed of the truck (TR. II, p. 8).[5] He then described what followed.

> A: When the officer [in the back of the truck] saw something strange, then the officer who had been with me in the patrol car got out. And saw [sic] that they were talking to each other there.
>
> Q: Had you been given a warning ticket at this time?
>
> A: No. No.
>
> THE COURT: When were you given the warning ticket?
>
> THE DEFENDANT: When the officer who is wearing the uniform had been walking around and saw something strange and he got down and he was talking to the other fellow, the officer who had been with me in the patrol car came back and started filling out the papers. And he said, no problem, no ticket; sign here. He never gave me the paper for me to read, because if he had given it to me, I would have read it and I wouldn't have signed it.

---

[4] Altamirano adamantly and repeatedly identified David E. Henderson ["Henderson"], a special agent with U.S. Immigrations and Customs enforcement as the trooper who pulled him over. Further details are provided *infra*.

[5] It is not clear to whom he was referring, but Altamirano indicated Barnes (TR. II, p. 13).

(TR. II, p. 8).[6]

Altamirano did not deny signing the consent form, but he contended that he never exercised control or possession of the form and never read the form because, while he was signing it, the trooper administering the consent kept the form covered with his hand (TR. II, pp. 10-12). In fact, he states that it was covered to such an extent that he did not realize the form he was signing was written in Spanish (TR. II, p. 12). Furthermore, he denied receiving any instructions from the trooper regarding the form and insisted that all the trooper said was "no ticket, no problem" (TR. II, p. 13). Finally, he did not ask to read the form because he "was nervous" (TR. II, p. 12).

The subsequent search of the vehicle involved removing the bed liner, whereupon the troopers discovered "[n]ine different guns, long guns, and some attachments like a choke and some items for a shotgun" as well as ammunition. (TR. II, p. 28). Further investigation led to the charge that Altamirano and his passenger unlawfully possessed "firearms and ammunition while being aliens who were then illegally and unlawfully in the United States" in violation of 18 U.S.C. § 922(g) (Doc. # 10, p. 1).

Altamirano filed this motion seeking to suppress "the firearms discovered during the traffic stop and subsequent search" (Doc. # 25, p. 8). Initially, Altamirano challenged not only the consent but also the validity and duration of the stop as well as the basis for Barnes' alleged suspicion that Altamirano was violating the law (Doc. # 25). At the suppression hearing on 3 May 2005, however, apparently after further review of the evidence, Altamirano

---

[6]Altamirano appears to be referring to the consent form, which he clams he signed before signing the warning ticket (Tr. II, p. 23).

explicitly limited his motion to the voluntariness of the consent (TR. I, p. 5).[7]

## II. DISCUSSION

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. CONST. amend. IV. While this has been interpreted generally to require law enforcement officials to obtain a warrant based on probable cause prior to searching even a vehicle, neither a warrant nor probable cause are required when a voluntary consent to search is obtained in advance. *See*, *e.g.*, **United States v. Santa**, 236 F.3d 662, 676 (11th Cir. 2000); **United States v. Butler**, 102 F.3d 1191, 1197 (11th Cir. 1997).

To be voluntary, consent must be knowing and freely given and cannot, therefore, be the product of duress or coercion. *See*, *e.g.*, **United States v. Purcell**, 236 F.3d 1274, 1281 (11th Cir. 2001). The burden is on the prosecution to prove by a preponderance of the evidence that the consent was voluntary, *see*, *e.g.*, **United States v. Pineiro**, 389 F.3d 1359, 1366 (11th Cir. 2004), and, when deciding the issue, the court must consider all of the circumstances, including the following:

1. "the presence of coercive police procedures";

---

[7]Altamirano's counsel stated, "[W]hat we are focusing on only is the consent to search, whether it was validly and freely given and knowingly given" (Tr. I, p. 5, ll. 9-11). In his motion, Altamirano's bases for challenging the consent were that he and his passenger "did not speak English and had little understanding of the English language," and Barnes instructed him, only in English, to "read and understand the form before signing" (Doc. # 25, p. 7). In addition, Altamirano "did not have control of the consent form and if fact [sic] Barnes had half the form covered with his arm when presenting it for the Defendant to sing [sic]." *Id.* With no further guidance from Altamirano, the court construes his challenge to be limited to the voluntariness of the consent.

    2.       "the extent of the defendant's cooperation with the officer";

    3.       "the defendant's awareness of his right to refuse consent";

    4.       "the defendant's education and intelligence"; and

    5.       "the defendant's belief that no incriminating evidence will be found".

***Purcell***, 236 F.3d at 1282.  The government has met its burden in this case.

The testimony in this case portrays the circumstances of the traffic stop and the events that followed in such starkly different ways that one version resembles the other in only the broadest of generalities. With little additional evidence, the court must base its decision primarily on which version of events is more persuasive. For the reasons that immediately follow, the court finds that Altamirano lacks credibility, and, therefore, the court resolves factual conflicts in accordance with Barnes' version of events:

- Despite both parties' and the court's efforts to clarify and confirm that he was not mistaken, Altamirano was unable to identify the trooper who pulled him over and repeatedly insisted that a federal immigration officer who testified that he does not conduct traffic stops, wear an Alabama trooper's uniform or drive a trooper vehicle did in fact pull him over in a trooper vehicle while wearing a trooper uniform (TR. II, pp. 4-7; 11-21). Making this testimony even more puzzling is the fact that the immigration officer attended the hearing wearing a green suit, while Barnes, whom he specifically stated did not pull him over, attended the hearing wearing his trooper uniform.[8] *Id.* Moreover,

---

[8] Even Altamirano's attorney commented, "I'm as puzzled by this as anyone" (Tr. II, 15, ll. 20-21).

> Barnes testified first, and the hearing took place less than two months after the incident.

- Altamirano also testified that three law enforcement vehicles pulled him over (Tr. II, p. 6), which, under the circumstances seems entirely implausible. Evidence in the record does not suggest that the police had any reason to carry out such a planned, multi-vehicle operation. Further, Altamirano identified no other troopers by appearance or by name.

- As noted *supra*, Altamirano testified that, even though he could not understand the trooper's question regarding his destination, he was able to provide an appropriate, explanatory response (TR. II, p. 6).

- Altamirano had a driver's license in someone else's name (not his own) and admitted falsely signing, or writing, the name "Noel Barragan" on the consent form, which was the name on the driver's license he provided Barnes (TR. II, pp. 22-23, 25).

- Altamirano's testimony that the trooper who pulled him over did not relinquish control of the consent form and covered the top of the consent form with his hand to such an extent that Altamirano could not even tell that the consent form was in Spanish is also implausible. Regarding the former claim, the apparent meticulousness with which Altamirano wrote the name "Noel Barragan" on the consent form, evidenced by its eminent neatness and lack of any stray marks whatsoever, belie his assertion that he did not have control over the form (Court's Ex. 1). Regarding the latter point, the size and shape

of the human hand simply do not allow the court to accept that either Barnes or the immigration officer could have covered the form to the extent necessary to conceal all of the information. Furthermore, below the signature line is the word "firma," the Spanish word for "signature," which means that even if the officer covered the upper portion of the form, Altamirano still would have reason to know that the form was written in Spanish. Finally, Altamirano admitted that he did not ask the trooper to remove his hand or allow him to read the form.

Conversely, the court has no reason to discredit Barnes' testimony, but acceptance of his version of events is not dispositive. Altamirano, who did not claim that any officer threatened him or acted in an intimidating manner, speaks and understands very limited English and, assuming that at least some of his testimony is accurate, he has only a very limited education (TR. II, p. 28). In addition, when the trooper sought consent, he was sitting with Altamirano in the front seat of the patrol car.

Notwithstanding these facts, the consent executed by Altamirano was voluntary. At the hearing, Altamirano read aloud the consent form he had signed and indicated that he understood that it meant that the police were "giving me this form to see if I agree to have them search my pickup truck and if I agree, to sign it" (TR. II, p. 28). He also stated that had he been permitted to read the form at the time of the stop, he "would have read it and . . . wouldn't have signed it" (TR. II, p. 8); therefore, he does not claim that his understanding of the form's meaning resulted from subsequent explanation. Consequently, neither the language barrier nor Altamirano's ninth grade education affected his ability to understand

the form's words, "I understand I have the right to deny my consent to the search above described and to deny or refuse to sign this form" (TR. II, p. 27).[9]

Furthermore, the fact that Altamirano was seated in the patrol car does not compel a finding that the consent was involuntary. *United States v. Gigley*, 213 F.3d 509, 514 (11th Cir. 2000) ("The fact that Defendant was sitting in the front passenger seat of Smith's patrol car, without more, does not make her consent involuntary."); *see also* *U.S. v. Taverna*, 348 F.3d 873, 879 (10th Cir. 2003) (stating that the fact that the defendant was seated in the patrol car did not amount to coercion). It was daylight, the stop took place on the side of a busy interstate highway and, although Altamirano stated that he was nervous (TR. II, p. 12), he provided no credible evidence that he was under duress or that Barnes otherwise coerced him to sign. His testimony that the trooper stated "no ticket, no problem", suggesting that Barnes misled him into believing that if he signed the consent form he would not receive a ticket, is, for reasons already discussed, not worthy of belief.

Therefore, the consent executed by Altamirano was voluntary. Specifically, the court finds that Altamirano took possession of the consent form, had ample opportunity to read it, was capable of understanding the form and did in fact understand the form. The court further finds that the defendant was not the victim of coercion, duress or misrepresentations.

---

[9] Altamirano also contends, depending upon which statement is to be believed, either that Barnes described the form in English or not at all (*compare* Doc. # 25, p. 7 *with* TR. II, pp. 12) and that this compromises the validity of the consent. The court disagrees. The form is self-explanatory and provides information beyond the constitution's requirements. *See*, *e.g.*, *United States v. Zapata*, 180 F.3d 1237, 1241 (11th Cir. 1999) (government need not establish that the defendant knew of his right to refuse consent). Furthermore, an individual with the wherewithal to obtain a false driver's license, purchase weapons at a retail store and navigate U.S. highways from North Carolina to Houston need not be told to read and understand a form he is asked to sign.

### III.   CONCLUSION

Therefore, it is the RECOMMENDATION of the Magistrate Judge that the motion be DENIED.  It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **26 August, 2005**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  **Nettles v. Wainwright**, 677 F.2d 404 (5th Cir. 1982).  *See* **Stein v. Reynolds Securities, Inc.**, 667 F.2d 33 (11th Cir. 1982).  *See also* **Bonner v. City of Prichard**, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on 30 September 1981).

DONE this 16th day of August, 2005.

/s/ Vanzetta Penn McPherson  
VANZETTA PENN MCPHERSON  
UNITED STATES MAGISTRATE JUDGE